## THE PENNLAND.

## THE ANNISTON CITY.

District Court, S. D. New York.
Aug. 30, 1934.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (W. H. McGrann

and J. Harvey Turnure, both of New York City, of counsel), for United States Steel Products Co. and the Anniston City.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for the Pennland.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Andrew J. McElhinney, both of New York City, of counsel), for Firemen's Fund Ins. Co.

GODDARD, District Judge.

These proceedings were instituted by the filing of the libel by the United States Steel Products Company against the steamship Pennland and Frederick Leyland & Co., Limited, owner of the Pennland, followed by a libel and amended libels by Frederick Leyland & Co., Limited, as owner of the Pennland, and bailee of her cargo, against the steamship Anniston City and the United States Steel Products Company. The suits arise out of a collision which occurred between the steamers Pennland and Anniston City off the approach to the outer entrance of Ambrose Channel on the morning of May 19, 1928, in which both vessels sustained damage. The cases have been consolidated for the purposes of trial, and were tried together. The Anniston City was inward bound, completing a voyage from the Pacific Coast to New York by way of Baltimore with a cargo of lumber. The Pennland was outward bound on a voyage to Antwerp and other European ports.

The Pennland is a combined passenger and cargo carrying steel vessel with triple screws; 16,499 tons gross; 9,874 tons net register; 601 feet in length over all; 67-foot beam; 45.6 depth of hold. Normal "full speed," 16 knots; "one-half speed," 10 to 12 knots; "slow speed," about 5 knots; "dead slow speed," 2 knots. She was scheduled to sail from Pier 61, North River, on May 18, but on account of fog did not leave her berth until about 5:35 a. m. (D. S. T.) the following morning. Her navigation was in charge of a Sandy Hook pilot, who was on the bridge with her master, the second, fourth, and fifth officers, three quartermasters. The visibility continued fair until after entering Ambrose Channel, where the fog set in thick. She proceeded down the channel slowly at reduced speed, sounding regular fog signals. On her way down the channel she was passed and overtaken by the Olympic, Ile de France, a freighter, and a Sandy Hook Pilot boat.

The testimony of the Pennland witnesses as to the events from this time on is as follows:

Her course down the last leg of the channel was S. E. ¼ E. Buoy I A (the last buoy at the outer entrance of Ambrose Channel) was abeam at 8:53 a. m., and their course was altered to S. E. ½ S. to make the Wreck buoy which was abeam by sound at 9:05 a. m. About five minutes after passing the Wreck buoy, while proceeding on the same course under slow speed, the fog whistle of a steamer was heard about three points on the port bow. The Pennland's engines, which had been under slow speed, immediately stopped, and her helm put to port. About 2 minutes later, after listening for fog signals from the same vessel and hearing none, a fog bell was heard on the same bearing. The Pennland navigators concluded that the fog bell came from the same vessel which had sounded the previous fog whistle, as the bearing was the same, and that the vessel had come to anchor, and her engines were put slow ahead and helm hard aport to give the supposedly anchored vessel a safe clearance. About a minute later, 9:13 a. m., the Anniston City looked out of the fog bearing about three points on the Pennland's port bow at a distance variously estimated by those on the Pennland to be about 600 or 700 feet. The Anniston City was heading for the Pennland's foremast on a course of about W. N. W., and was showing her starboard foremast to the Pennland, and was proceeding at a speed estimated at 4 to 6 knots and throwing a bow wave. The Anniston City sounded a one-blast passing signal and apparently hard aported her helm and then sounded three blasts of her whistle. The Pennland answered the Anniston City's one blast with one blast, put her engines full speed ahead, and, in order to swing her stern away from the on-coming Anniston City, put her helm hard astarboard; however, the Anniston City had too much headway, and failed to swing to starboard, and her stem and port bow struck the Pennland's port side about 50 feet forward or admiships at an angle of three to four points, and scraped along the Pennland's side for about 50 feet. At the moment of impact the Pennland was heading S. ½ E.; the Anniston City—290° true. The Pennland was under a starboard helm and the Anniston City under a port helm. The collision occurred at 9:13½ a. m., Pennland time, or about a half minute after she

sighted the Anniston City. The Pennland's engines were stopped immediately after the collision, and, when the vessels were clear of each other, she anchored about one mile south of the Fairway buoy at 9:26 a. m.

The Anniston City is a steel cargo carrying vessel, single right-handed screw, about 5,687 gross tons, 3,450 net tonnage, 424.2 feet in length over all, and 56.2-foot beam. At a maximum of 83 revolutions her full speed is 12 knots. Her master testified she was 11 knots at sea and 10 knots in the harbor. At "half speed," at 40 to 40½ revolutions, 6 knots; "slow speed," at 21 to 23 revolutions, 3 knots. The Anniston City left Baltimore on the evening of May 18 and arrived in the vicinity of Ambrose Channel light vessel on the morning of May 19 at 8 a. m., as it was foggy, and she came to anchor 1½ to 2 miles from Ambrose Channel light vessel, which bore about 207° true by sound, to await a pilot. The version of the Anniston City's witnesses of what occurred from then on until the collision with the Pennland is as follows:

At 8:10 Pilot Sullivan came aboard, and, after discussing the fog and the visibility, it was decided to get under way, and the Anniston City left her anchor and proceeded at slow and half speeds heading on a N. W. course toward the entrance to Ambrose Channel, keeping to the southward of Ambrose Channel light vessel and the Fairway buoy, which was located by sound abeam to starboard. Her engines, which had been stopped, were put slow ahead and her helm ported so as to head toward and to clear the southerly Seneca Wreck buoy and to leave it to starboard. Soon after, a fog signal was heard a little on the starboard bow. Immediately her engines were ordered put full speed astern. Half a minute later the Pennland was sighted bearing one point on her starboard bow and heading across the Anniston City's bow on a course from starboard to port, and variously estimated to be from 400 to 2,000 feet away, proceeding at high speed. The course of the Pennland intersected that of the Anniston City's at an angle of three to four points. Upon the Pennland being sighted, the Anniston City sounded a signal of one blast, and hard ported her helm, and a signal of three blasts was also sounded to indicate that the Anniston City's engines were going full speed astern. The Pennland answered her signal with one blast of her whistle and altered her course to starboard, swinging down on the Anniston City and colliding with her; the port side forward of amidships of the Pennland coming in contact with the stem and port bow of the Anniston City. At the moment of the collision, the Anniston City was at a standstill in the water, making no headway, and was swinging to her starboard away from the Pennland. According to the deck time of the Anniston City, the collision occurred at 9:12 a. m., and by engine room time at 9:13½ a. m., about one minute after the Pennland was sighted. At the time of the collision the Anniston City was on a course of 290° true.

The range of visibility at the time of the collision has been variously estimated by the Pennland's witnesses to have been six to seven hundred feet, and by those of the Anniston City from four hundred to two thousand feet. Each vessel contends that the other was solely at fault. The principal specific faults charged against the Anniston City are: Proceeding at immoderate speed in the fog; violation of article 16 of the Inland Rules (33 USCA § 192); for leaving her anchorage in the thick fog; in approaching the entrance to Ambrose Channel to the southward of the Fairway buoy in the track of vessels bound out of the channel. On the other hand, the Anniston City charges the Pennland with proceeding at immoderate speed in a fog; altering her course in the fog under a hard aport helm (before the Anniston City was sighted); not stopping and reversing her engines on sighting the Anniston City instead of increasing her speed to "full speed" ahead.

At the outset, it is necessary to fix as nearly as possible the location of the collision. The weight of the evidence is that it took place in the vicinity of one-quarter mile south of the Fairway buoy which is located 2¼ miles off the outer entrance of Ambrose Channel. The master of the Anniston City testified that 11 o'clock on the morning following the collision he took her bearings from where she was anchored, which was approximately the location of the collision, "and the Fairway buoy was bearing 36 degrees true, a distance of about a quarter of a mile." Sandy Hook Pilot Sullivan of the Anniston City reported to the pilot commissioners that the collision occurred one-quarter of a mile from the Fairway buoy. It is difficult to reconcile the testimony of the various witnesses regarding the location of the collision, due, perhaps, to the fact that some of their statements are only estimates made without opportunity for very exact observations, but this location of collision is also confirmed by retracing the movements of the Anniston City from the time she left her

anchorage and by her logs, bell books, together with her gyro compass course record.

One reason for locating the place of the collision is to see what distances were covered, how much time elapsed, and what the respective engine movements were between the time when the Anniston City left her anchorage and the collision and the time when the Pennland was abeam of Buoy I A (at the outer entrance of Ambrose Channel) and the collision, for, while these events were remote from the collision, they aid in determining the speeds and positions of the vessels when they were approaching each other and heard the other's fog signals.

The principal issues of fact presented are the speeds of the vessels when they respectively heard the first fog signals from one another, and did the Anniston City run into the Pennland? Or did the Pennland's after end swing up against the bow of the Anniston City when the Anniston City's headway was stopped?

Looking backward at the distance covered by the Anniston City when she left her anchorage 1½ to 2 miles from Ambrose Channel light vessel with the light vessel bearing about 207° true by sound which she left at 8:18 a. m. by her bridge bell book and 8:20 according to her engine bell book, to the time of the collision at 9:12 recorded in her smooth log and testified to by her witnesses, it appears that she traveled the distance of about 5 miles (4½ if she was anchored 1½ miles from the light vessel) in 54 minutes or average steaming speed of a little more than 5 knots; this, however, does not take into consideration 18½ minutes in which her engines were said to have stopped, 2 minutes at "full speed" astern, 16½ minutes "slow speed," and 13 minutes "half ahead," deducting the periods when her engines were stopped or going astern at a total of 20½ minutes. According to her own testimony and records, her actual steaming time was 33½ minutes, or a steaming speed of around 8 knots. While this is not very accurate, as certain minor conditions such as tide, momentum, etc., are generalized, it does tend to refute the testimony of the Anniston City's witnesses that "she had no way on her at all to speak of during the morning," and casts a doubt upon the Anniston City's testimony as to her speed when she heard the fog whistle from the Pennland.

Assuming the courses and bearings of the two vessels when they came in sight as stated by the Anniston City's witnesses, the Anniston City on a course of 287° true and the Pennland on a course of S. ½ E. and bearing one point on the starboard bow, if they were 1,500 feet apart, the Anniston City must have advanced 1,085 feet, or at an average speed of over 10 knots during the minute which elapsed between sighting the Pennland and the collision. If they were 1,000 feet, and the bearing of the Pennland was two points (allowing for a margin of error in the estimate, although the Anniston City's testimony is that it was "about 1 point"), the Anniston City must have advanced 520 feet to reach the point of the collision after sighting the Pennland at an average speed of something over 5 knots. Based upon the estimates of the Pennland's witnesses that they were six to seven hundred feet apart when they came in sight of each other, and the interval of time of half to three quarters of a minute, the Anniston City would have advanced about three hundred feet, or an average speed of 4 to 6 knots. That the Anniston City did not advance at 10 knots may safely be granted, and it is obvious that the Anniston City did not have so much distance to cover; 1,500 feet undoubtedly is an overestimate of the visibility. Assuming 1,000 feet as the distance they were apart when sighted, which seems to me to be a fair average of all the credible estimates, and assuming the bearing of the Pennland two points, which, in view of her testimony, is certainly fair to the Anniston City, the result is that her average speed in the minute before the collision was about 5 knots, and the Pennland, on her side of the triangle, would have proceeded at about the same average rate of speed in that time to arrive at the point of contact, the Pennland's speed increasing, and the Anniston City's decreasing, as she went into reverse. It is a reasonable inference that, when the Anniston City sighted the Pennland, the Anniston City was proceeding at more speed than thereafter, when her engines were reversed, so that when she observed the Pennland she was proceeding at more than 5 knots.

█ Admiral Robinson has prepared a "track" of the course of the Anniston City from the time of the collision to the time and place she left her anchorage. This "track" is a combined tabulation of her engine movements according to her bridge bell book and her engine bell book, her headings as evidenced by her gyro compass record, and has computed her speeds on the various times. Although these computations are objected to by the proctor for the Anniston City, I see no good reason why the court

may not use them as an aid. I have studied them with some care, and with some possible minor exceptions I believe they are correct. These computations show that the speed of the Anniston City when she sighted the Pennland was 5.45 knots, and her speed at moment of collision was 3.7 knots. Aside from the results of these computations, I should also add that I was convinced, after hearing various witnesses, that the Anniston City was moving ahead, although turning slightly to her starboard at the time of the collision.

There are a number of erasures in the Anniston City's log and bell books. Some of the entries in her smooth log prepared by the chief officer were later revised by her master, and, after the collision and following a conference between the master and one or more of the officers, the master dictated the entries.

"9:12 In collision with SS Pennland

"We were dead in water at time of collision.

"The Pennland struck us on port side abaft midship, damaging plates and frames above water line.

"9:10½ Slow ahead hearing whistle ahead rang full astern."

Such entries are more in the nature of a favorable description of what had previously occurred than a contemporaneous record of events recorded at the time by the one observing them; and the circumstances under which some of the entries were made and the appearances of others leave the impression that they are not altogether to be relied upon.

The Pennland covered the distance from Buoy II (at 8:04 a. m.) to Buoy I A (8:53 a. m.) at an average speed of 5.38 knots, and from Buoy I A to the point where she stopped her engines at 9:10 a. m. at about the same average speed, and the testimony is that with her engines stopped her headway diminished at the rate of about 1½ knots per minute, so that her headway at 9:12 was about between 2 and 2½ knots. At 9:12 her engines were put ahead again at slow speed, and for about one minute her engines continued at slow speed, and the proof is that her speed would increase in this interval of a minute about 2 knots, so that at 9:13, when she sighted the Anniston City, the Pennland was proceeding at about 4½ knots an hour. After the exchange of the one-blast signals, the Pennland put on full speed, and it was estimated by the various witnesses that at the time of the collision she was proceeding at a rate of upwards of 7 knots an hour.

The contention urged in behalf of the Anniston City that while she was at a standstill the Pennland swung her afterpart against the Anniston City's bow is contrary to the physical evidence as well as the weight of the credible testimony. The injury in the side of the Pennland was of such a character as would have been caused by the bow of another vessel striking her, and was not such as would result from her dragging across the bow of a vessel. Also it was not in the afterpart but 50 feet forward of amidships. Moreover, if it be assumed that the Pennland's helm was hard aport during this entire time, and the testimony of the Pennland is to the contrary, she would have swung less than 25 feet toward the Anniston City (Knight's Modern Seamanship [9th Ed.] p. 346), so that it is impossible to account for the distance that was covered from the time of sighting to the moment of contact on any reasonable theory, unless the Anniston City was continuously moving ahead until the vessels met. The testimony of a witness on the Anniston City that the Pennland's stern was swinging down upon the bow of the Anniston City, that he saw the Pennland's rudder hard over to port, that he heard some one on the bridge of the Pennland shout "Hard aport," at least adds nothing to the Anniston City's case, as the truth is that the Pennland has a "full cruiser" stern, and her rudder could not have been seen, and none of this witness' statements were impressive. I think it is fully established that the Anniston City had not been stopped and that her bow struck the side of the Pennland as the Pennland was crossing her bow.

Allowing for proper adjustment of the clocks, each vessel observed the other about the same time, and each had previously heard the fog whistle of the other. The Pennland first heard the Anniston City's fog whistle on her port bow 3½ minutes before collision, and stopped her engines and ported her helm half a point. After 2 minutes a fog bell was heard from the same bearing, and her navigators believed it came from the same vessel, and her engines were put slow ahead and her helm put further to port, then hard aport. At a minute later the Anniston City came in view. The Anniston City blew a one-blast signal and followed by a signal of three blasts to indicate that her engines were going full speed astern. The Pennland answered with one blast, put her engines full speed ahead, and hard astarboarded her

helm. Pilot Sullivan, in charge of navigation of the Anniston City, testified that he intended the Pennland to cross his bow and pass the Anniston City port to port, and those in charge of the navigation of the Pennland said that this is what they attempted to do. That both realized the danger of the situation and adopted what appeared to them as the best plan of avoiding the collision is probably quite true, but the difficulty was the result of their getting into the dangerous situation.

It appears from both of the Anniston City's bell books that her engines were not actually in astern motion for more than a minute before the collision. At the speed she was proceeding when the "full speed astern" was given, the reversal of the propeller tended to counteract the hard aport helm, so that she only swung to starboard about 3°, which was not enough to clear the Pennland.

▇ The collision occurred in inland waters. Article 18, rule 1, of the Inland Rules (33 USCA § 203, rule 1), provides that, when vessels are approaching each other head and head, the exchange of a one-blast signal indicates an intention to pass port to port. Such a passage was proposed by the Anniston City and accepted by the Pennland. The Anniston City was unable to comply with it, as she was moving at such a speed that she could not; because of the fog, her navigators were unable to see the Pennland a sufficient distance away to stop or turn in the Anniston City's share of the distance which separated the two vessels. She was clearly not proceeding at the "moderate speed" required by article 16 of the Inland Rules (33 USCA § 192).

[3] It appears that the Pennland, after the vessels came in sight of each other, attempted to do what the navigators of both vessels then decided she should do in their mutual efforts to avoid a collision. But did her movements during the interval of 3½ minutes in which she heard the Anniston City's fog signal and bell contribute to the situation which resulted in the collision, and was she navigating at the moderate speed and caution which the circumstances required? Her own testimony is that the Anniston City was within 600 or 700 feet of the Pennland when she first saw it a little more than her own length away (601 feet) about one-half minute before the collision. This distance and time was not enough for the Pennland to stop before reaching the path of the Anniston City. The testimony of the navigators of

the Pennland is that they did not hope to be able to bring her to a standstill within that distance, and the weight of the evidence is that they could not. In my opinion, the Pennland was not navigating with sufficient caution and relatively moderate speed when at 9:12 she went ahead at "slow speed" about 4½ knots, instead of "dead slow," which would have been plenty for steerage way, after hearing the Anniston City's fog whistle and bell in the vicinity, and erroneously assuming that she had come to anchor. Her position seems to correspond to that in The City of New York, 147 U. S. 72, at page 84, 13 S. Ct. 211, 216, 37 L. Ed. 84, where it stated: "Upon hearing the fog horn of the barque only one point on her starboard bow, the officer in charge should at once have checked her speed, and, if the sound indicated that the approaching vessel was near, should have stopped or reversed until the sound was definitely located, or the vessels came in sight of each other."

In The Lepanto (D. C.) 21 F. 651, at page 659, Judge Brown stated: "It is always safe to stop and reverse; at least, as regards the charge of fault. If she does not stop and reverse, when it is shown by the event that by doing so the collision might have been avoided, she must establish a clear justification for her course or be condemned. The Khedive and The Voorwarts, etc., 5 App. Cas. 876, 890, 908. 'The rules are applicable from the time the necessity for precaution begins, and continue so long as the means and opportunity to avoid danger remain.'"

It is also charged that the Anniston City was at fault for approaching the entrance to Ambrose Channel to southward of the Fairway buoy. The Pennland's contention is that in doing so the Anniston City was placing herself in a position to enter on her own port side of the channel instead of the starboard, in violation of the recognized rule stated by La Boyteaux in his book "Rules of the Road at Sea," that "a steamer intending to enter a narrow channel should so maneuver in approaching the entrance as to leave ample room for outcoming vessels to pass her port to port, and should if practical, approach the channel from the side she must keep after entering it." Page 166.

▇ In the cases in which this rule has been applied, the collisions have occurred in the channel or in the immediate vicinity of its entrance. This collision occurred 2½ miles from the entrance of Ambrose Channel in water described by Judge Adams in The Kentucky (D. C.) 148 F. 500, page 504—"the

open ocean." And I am not inclined, under the present circumstances, to hold the Anniston City guilty of a serious contributing fault in being where she was. Three Sandy Hook pilots testified that pilot boats, when on station, frequently take a position southward of the Fairway buoy, and, upon boarding an incoming vessel, proceed on a straight course for the entrance of the channel. The testimony of all the witnesses indicated that this was not unusual.

In view of the testimony that there was a visibility of upwards of 2,000 feet at the time the Anniston City got under way, that the three or four other steamers, including the Ile de France, the Olympic, were navigating in or out to sea (La Bourgogne, 86 F. 475 [C. C. A. 2]), and those in charge of the Pennland had not considered it necessary to anchor when she arrived in the vicinity, I do not think the Pennland's charge against the Anniston City for leaving her anchorage is sustained.

The faults of both vessels directly contributed to the collision, and it is a case for the sharing of the damages resulting. A decree may be entered accordingly, with the usual reference to determine the amount.