THE DIXIE SWORD.

THE JOSEPH H. MORAN.

THE JOSEPH H. MORAN, Inc.

THE MORAN NO. 92.

Nos. 16496, 16639.

District Court, E. D. New York.

Oct. 9, 1944.

Dow & Symmers, of New York City (Wilbur E. Dow, Jr., of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark, Frederic Conger, and Charles E. Wythe, all of New York City, of counsel), for the Joseph H. Moran and the Moran No. 92.

GALSTON, District Judge.

It was stipulated that the libel and cross-libel suits be consolidated and tried together.

The collision took place in international waters not far from the Ambrose Channel, at about four o'clock on the morning of December 4, 1941. The Dixie Sword, an ocean-going vessel, bound north, was approaching the channel at the same time that the tug, Joseph H. Moran, and her tow of two barges were also proceeding northerly, but on a crossing course. Visibility was greatly restricted owing to a dense fog.

It is the contention of the Dixie Sword that while proceeding slowly she heard the towing whistle of the tug and then stopped, reversed her engines and lay dead in the water. The tug crossed and the first barge came into view. From those on the first barge the Dixie Sword ascertained that there was a second barge in the tow, though it was not at that time visible. The Dixie Sword was put full speed astern for the second time, but the on-coming barge with some sheer, for the tug had hauled to the right, came in contact with the Dixie Sword. The hawser parted and the barge went adrift.

The Dixie Sword contends that the collision was brought about because the tow, which had left the dumping grounds, was not justified in crossing a busy international lane in the dead of night, and in the dense fog which prevailed, and in proceeding with hawsers 225 fathoms in length from

the tug to the first barge, and 90 fathoms between the barges.

It is conceded that the length of the tug, the barges and the hawsers totaled about 2,200 feet. The tug was proceeding at about three knots per hour and heard, abaft the beam, a fog signal from the steamer. The master of the tug at first thought the sound indicated that the vessel was going out to sea. However, as the distance narrowed, the tug blew alarms. The man on the tug heard three whistles blown from the steamer, which indicated that she was putting her engines full speed astern. The resulting collision damaged the starboard side of the ship, about 30 or 40 feet aft of the bow.

The Dixie Sword, on the occasion of the trip in question, was bound from Savannah, Georgia, to Carteret, New Jersey. Sequeira, the second mate, had the twelve to four watch. When he came on watch the ship was about twenty-eight to thirty miles below Ambrose Light and proceeding at half speed, with a heavy fog, the seas calm, and a light northerly wind prevailing. The visibility was very poor.

From the rough log it appears that at 1:35 A. M., hearing a whistle ahead, the vessel stopped; at 1:45 A. M. it proceeded slow ahead. The next change in engine speed was at 3:49, when the vessel stopped on hearing the tow whistle of a tug. Sequeira was of opinion that the whistle was off the starboard bow. After stopping he heard the tug signal again and then he heard an alarm signal of four short blasts. The Dixie Sword went full astern at 3:50 and stopped at 3:58, remaining dead in the water. During the time that the vessel was going astern, the towing signal was again heard several times, as was also the alarm. After the Dixie Sword stopped, the tug was seen for the first time about four points on the starboard bow and only fifty yards away. It was at that time that the captain of the tug called to the captain of the Dixie Sword: "starboard your wheel," and Captain Jensen, of the Dixie Sword answered: "I have no headway." All that Sequeira could see was that there was a hawser tow. He could not see either of the scows. Then the chief mate, Mowbray, arrived on the bridge to relieve Sequeira. The engines were put full astern for about three or four minutes and were then stopped. Sequeira, in his own room five minutes later, felt the shock of the collision. At that time the Dixie Sword was still going astern and as Sequeira came on deck, the second of the barges was adrift off the starboard bow.

The rough log shows that the engines were full astern at 4 A.. M. and stopped at 4:02 A. M. Then at 4:13 A. M. the engines were again put full astern. The second barge, according to this log, sheered as it struck the ship at about 4:17 A. M. Engines stopped at 4:18 A. M.

■ It is contended that the Dixie Sword's rough log has been tampered with, particularly with respect to the entries "3:49 A. M." and "3:58 A. M." These entries to the naked eye do look somewhat clouded, though the entry "Stopped at 4:02 A. M." seems clear enough, as does the entry "The tug boat passed about 50 yards ahead of ship and the engines again were put full astern at 4:13." It is most unfortunate, however, that the Dixie Sword was unable to produce either her engine bell book or deck bell book. This failure thus calls for careful weighing of the entries. See The Glasgow Maru, 102 F.2d 450; The Pennland (The Anniston City), D.C., 9 F. Supp. 377, affirmed Frederick Leyland & Co. v. The Anniston City, 2 Cir., 82 F.2d 1008; and also The Silver Palm, 94 F.2d 754. Added to the suspicious nature of the entries it must be noted that on no other pages of the log does one find entries from the left hand page running to the corresponding right hand page, as on the two corresponding left and right hand pages covering the period of the accident. As the matter thus stands, the Dixie Sword's rough log book has not predominant weight as evidence.

■ The Dixie Sword must be held at fault because of the unsatisfactory evidence offered that she stopped her engines in accordance with the requirements of Article 16 of the International Rules of Navigation, 33 U.S.C.A. § 92.

The deposition of Captain Jensen, the master of the Dixie Sword, before the local inspectors, was offered in evidence by the Dixie Sword. He testified on December 12, 1941, eight days after the collision. He was examined not only by the local inspectors and by counsel for the Dixie Sword, but also was cross-examined at considerable length by counsel for the Moran. Unfortunately, Captain Jensen met his death when the Eastern Sword, of which he was then master, sank. Thus the question is raised whether the deposition is ad-

missible as against the Moran. It is argued that the testimony of the master would be admissible only if offered by opposing counsel as admissions against his vessel, and that it is not admissible when offered by the ship owner.

■ On the whole I think that the common law rules of evidence should not be strictly enforced against the ship in the particular circumstances surrounding the issue here presented. Generally speaking, testimony between the same parties given at a prior trial would be admissible in evidence on proof of inability to produce the missing witness. It is true that the hearing before the local inspectors is a hearing not between private adversaries, for the local inspectors constitute an administrative body authorized by Congress, 46 U.S.C.A. § 361 et seq., with broad functions to investigate and report as to violations of steamboat laws. But it is an impartial body and the witnesses who appear are sworn and counsel for the parties whose interest are affected are permitted to attend the hearings and to examine and cross-examine. In this instance Captain Jensen was cross-examined at considerable length by the same counsel who appears in the pending causes, and if cross-examining counsel had had the benefit of the missing log books, I should be disposed to overrule his objection to the admission of the deposition. During the course of the master's examination he refreshed his recollection by reference to the log of the Dixie Sword. It was not described as the rough log, and the smooth log is not before us.

However, so far as the result is concerned, my findings would not be changed by Jensen's testimony before the local inspectors, for since the trial the deposition of Mowbray, the Chief Officer of the Dixie Sword, was taken by the Dixie Sword, but in the absence of the bell book must be received with some reservation. Not only is comparison between the entries in the bell books and the entries in the rough log impossible, but, as has been indicated, the condition of the rough log is not satisfactory. See The Arabic, D.C., 34 F.2d 559.

■ Since the collision occurred at sea, in international waters, about six miles south of Ambrose Light Vessel, it is argued by the Moran that tows are not required to shorten hawsers until they reach the inland waters. As a general proposition that might be conceded. On the other hand, the general maritime rules of cautious seamanship require observance of the prevailing weather conditions and the proximity of a well-traveled ocean lane. Fault, therefore, was attributable to the Moran in proceeding at night from the dumping grounds in a dense fog, across the southern approach to Ambrose Channel without shortening her hawsers. See The Camden, D.C., 283 F. 326; The Pennsylvania, 86 U.S. 125, 22 L.Ed. 148. The Moran failed also to stop her engines on getting the fog signal from the Dixie Sword. It is true that in Steffens v. United States, 2 Cir., 32 F.2d 206, 208, it is said that such duty as is set forth in the second paragraph of Article 16 of the International Rules is absolute only when the ship believes that the signal comes from ahead. Judge Learned Hand went on to observe: "When the direction is uncertain, navigation is left * * * to the master's judgment * * *." I do not believe that in this case the master of the Moran was justified in believing that the signal did come from ahead, for "a fog conceals the direction of sound and the place of its origin."

■ Moreover, it may be noted that though the rule of the road does not require fog signals to be given by barges in tow, nevertheless again in the circumstances which prevailed on the night in question, with the heavy fog and the proximity to ocean bound steamer lanes, with the barges separated by long hawsers from the tug and from each other, some signal should have been given from the barges to acquaint the on-coming vessel of the proximity of danger. The City of Alexandria, D. C., 31 F. 427, 430. In this case Judge Brown observed: "While there is no statute nor regulation that in terms requires a tow thus situated to give such signals, there is none that forbids it; and every vessel is bound by the general maritime law, as is recognized by the provisions of article 24 of the new rules, to give such reasonable notice of obvious danger as the special circumstances may require, and such as are easily within her power to give." See also The Harold, D. C., 84 F. 698. The hand fog horn used by the bargeman on the second scow was entirely ineffectual.

Accordingly, each party may have half damages.

Appropriate findings of fact and conclusions of law will be filed concurrently with this opinion.