**THE ANACONDA.**

**THE SYOSSET.**

**No. 5624.**

Circuit Court of Appeals, Fourth Circuit.

Nov. 10, 1947.

Barron F. Black, of Norfolk, Va. (Vandeventer & Black, of Norfolk, Va., on the brief), for appellant.

Leon T. Seawell, of Norfolk, Va., for appellees.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Smith-Douglass Company, Incorporated, filed in the United States District Court for

the Eastern District of Virginia, a libel against the Oil Screw Syosset and Woodford Townsend and James Townsend. The District Court dismissed the libel and libellant has appealed.

Libellant was the owner of the barge Anaconda, of the burden of 2,217 gross tons, with a length of 267.3 feet, a width of 46 feet and a depth of 23.6 feet. The Syosset was a diesel ocean tug of the burden of 176 gross tons, with a length of 102.6 feet, a width of 23 feet and a depth of 10.5 feet.

The libellant's predecessor, Smith-Rowland Company, to whose rights libellant succeeded, engaged the Syosset at $750 per day to tow the Anaconda, loaded with 3,600 tons of coal from Norfolk to Port Everglades, Florida. Under this contract the tug Syosset, with the Anaconda in tow, left Norfolk on June 25, 1942. Since enemy submarines were active at this time on the Atlantic coast, the Navy had issued orders that coastwise shipping must each night put into harbors along the coast. The Syosset and her tow, in pursuance of these orders, put into several ports during the course of the voyage. The tug and barge entered the outer harbor of Savannah Georgia, between 10:00 and 11:00 P. M. on the night of July 8. At this time the channel buoys were in place and lighted. The channel was 29 feet deep at low water, and 500 feet wide. The Anaconda was drawing between 23 and 24 feet.

Libellant stoutly maintains that due to negligent navigation by the tug Syosset, the barge Anaconda grounded in the Savannah harbor, causing serious damage to the hull of the barge. This contention is vigorously denied by the respondents. The District Judge found that the barge "scrubbed" the bottom at Savannah without a grounding and dismissed the libel.

The record discloses conflicts in the evidence which are sharp and many. We are, of course, bound by the well known rules that it is the primary function of the trial judge to pass on the credibility of witnesses and that the trial judge's findings of fact are entitled to very great weight. On the other hand, there is a clear responsibility resting upon an appel-late court in admiralty cases as to questions of fact. Quite germane in this connection are the oft-quoted words of Mr. Justice Swayne in The Ariadne, 13 Wall, 475, 479, 20 L.Ed. 542:

"We are not unmindful that both the Circuit and District Court came to a conclusion different from ours as to the alleged fault of the steamer.

"Their judgments are entitled to and have received our most respectful consideration. Their concurrence raises a presumption, prima facie, that they are correct. Mere doubts should not be permitted to disturb them. But the presumption referred to may be rebutted. The right of appeal to this Court is a substantial right, and not a shadow. It involves examination, thought and judgment. Where our convictions are clear, and differ from those of the learned judges below, we may not abdicate the performance of the duty which the law imposes upon us by declining to give our own judicial effect."

See, also, the opinions of Judge Learned Hand in Thorne, Neale & Co. v. Reading Co., 2 Cir., 87 F.2d 694, 696; Judge Denman in The Ernest H. Meyer, 9 Cir., 84 F.2d 496, 501; and Judge Northcott in Courtney v. Walker, 4 Cir., 26 F.2d 583, 585. A careful review of the evidence in the record before us and particularly of the surrounding physical facts convinces us that the judgment of the District Court is clearly erroneous and must therefore be reversed.

The District Judge in his opinion below said, in connection with the testimony of Captain Lupton of the Anaconda: "Captain Lupton, admittedly, changed the entry in his log. I am not prepared to say to what extent that should affect his credibility, but, despite that, I was rather impressed with the apparent frankness and truthfulness of the man on the witness stand. I believe he told about what happened."

The log of the Anaconda for July 8 and July 9, 1942, when it came into the hands of libellant, contained these entries:

"July 8th—Underway at 5:00 A. M. and anchored at Savannah, Ga., at 10:30 P. M."

"July 9th—Underway at 5:00 A. M. wind west anchored at Brunswick, Ga., at 10:30 P. M."

Now the uncontradicted testimony of the handwriting expert, Drummond, was that the original entries in this log for these days had been erased and that the original entries actually read:

"July 8th—Underway at 5:00 A. M. and anchored at Savannah, Ga., at 10:30 P. M. Barge struck bottom while towing in 10 * * * ebb tide wind west. Moderate. Lay ashore about 1 hour."

"July 9th—Underway 5:00 A. M. wind west anchored at Brunswick, Ga., at 10:30 P. M. Wind south fresh."

Apparently the District Judge paid little heed to the original entry as evidence (apart from its effect on the credibility of the witness) of what really happened in Savannah harbor. The decided cases contain strong language on this point. Thus, in Glasgow Maru, 2 Cir., 102 F.2d 450, 453, Judge Learned Hand said: "Be that as it may, the condition of the log and the unsatisfactory explanation of it, coupled with the testimony of those who freshly examined it, are enough; we cannot avoid the conclusion that it had been dressed up to excuse the ship's faults. That goes much further than merely to discredit the document itself; it is positive evidence upon the very issue, and weighty evidence as well. Wigmore, § 278. When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt."

And in a leading work, Benedict on Admiralty, V. 3, p. 7, we find: "The evidentiary value of a log book rests upon its contemporaneous character; hence a rough log written up immediately is more persuasive than a smooth log written up subsequently, and an alteration in a log book is to be judged according to its apparent contemporaneous or subsequent character."

See, also, the Ashley-Sheadle, 1938 A. M.C. 1106; The Sicilian Prince, D.C., 128 F. 133, 136; The President Madison, D. C., 13 F.Supp. 692, 694; The Pennland v. Anniston City, D.C., 9 F.Supp. 377, 381.

Admittedly, Lupton's relations with the libellant were unfriendly, and also the respondents seemingly were unwilling to vouch for him, inasmuch as he was offered as a witness for the court. His oral evidence was unquestionably favorable to the contentions of the respondents.

Lupton, though he admitted his erasure of the original entry, denied that one part of the erased entry had been made by him, in direct conflict with the testimony of the handwriting expert; the District Court, however, expressly found that Lupton made that part of the entry which he denied. Lupton was an intimate friend of Captain Cudworth of the Syosset. The District Court found, too, that Lupton knew of the scrubbing but that Cudworth "may have known or he may not have known of the scrubbing." Nevertheless, neither Lupton for the Anaconda, in the changed entry on his log, nor Cudworth, in the log of the Syosset, made any entry of the scrubbing.

Cudworth, the Captain, and Swain, the pilot, of the Syosset, testified that there was no grounding of the Anaconda. Both were, of course, highly interested witnesses. A grounding of the Anaconda in a well marked channel 500 feet wide would be a serious reflection upon their skill as navigators of the tug. Naylor, donkeyman on the Anaconda, testified that Cudworth said to Lupton: "Keep everything under your hat. It might cause me to lose my ship if they knew it. I am supposed to know these waters."

The testimony of the witnesses who might be called neutral was almost wholly in favor of the libellant. Gibbs, who served as cook and seaman on the Anaconda, testified that "the fellow (Voliva) at the wheel (of the Anaconda) * *. * hollered we were aground. * * * Well, as he hollered, I turned around and it staggered me; well, it staggered all of us that were up on the bow." He stated, also, that the Anaconda listed to port. This testimony was confirmed by that of Naylor, and that of Thompson of the Syosset.

The testimony of Ensign Geer (given in person) and that of Commander Jenkins (whose deposition was read) was

presented when the District Court reopened the case, after having entered its first opinion dismissing the libel. In a supplementary opinion, the District Court stated: "Upon consideration of the testimony introduced at the rehearing of the above case and the comprehensive briefs filed by proctors, I have reached the conclusion that I should adhere to the decision originally made."

Ensign Geer's statements were clear, direct and positive. He first boarded the Syosset about 8 P. M. on July 8, 1942, and tendered a pilot to Cudworth, who refused this offer on the ground that he had a licensed coastal pilot on board. About 10 P. M. Geer boarded the Anaconda and found that the Anaconda was aground with a list to port. He testified that he asked Cudworth (then aboard the barge) what was wrong and Cudworth replied that the barge was aground but in no danger. Geer reported his findings to his superior officer, Commander Jenkins. Geer further stated that the whole incident made an impression on him because he warned Cudworth not to leave the harbor in the morning before the mine sweeper had swept the channel. This warning was disregarded by Cudworth, and when the tug and barge left before the sweeping of the channel, Geer feared he might be reprimanded for permitting this to happen.

In this, Geer was supported by the deposition, taken at Savannah, of Commander Jenkins, who testified that he received the messages from Geer, including Geer's report of the grounding of the Anaconda. Both Geer and Jenkins were neutral witnesses, each an officer in the United States Navy at the time of the Savannah incident, and without any interest in the outcome of the instant libel.

We now come to an analysis of certain physical facts in this case. The Anaconda, built in 1921, was sturdier that the ordinary barge. It had originally been intended to install engines in her hull and to use her as a ship. After some damage from a fire, she was repaired and put in excellent condition at a cost of approximately $60,000. Hudson, a marine surveyor in charge of these repairs, reported

the Anaconda to be then in good seaworthy condition and with no hog in her hull. He valued the barge at $125,000. Representatives of the American Bureau of Shipping and Lloyd's inspected the Anaconda and declared her seaworthy. Testimony on this point was also given by the following witnesses: Lawrence, Lupton, Gibbs and Gettinger.

These repairs were completed in April, 1942, and the Anaconda was hauled on the ways at Havana slightly more than three months later. In the meantime, of course, the incident at Savannah had occurred. There was clear testimony by DeMars, an experienced marine surveyor who examined the Anaconda at Havana. He testified that there was a bare spot on her hull with the tree nails protruding; also that there was a hog on her hull. He gave his opinion that her condition showed a grounding and that hogs ordinarily are the result of grounding. Other surveyors were present at Havana but none of these was produced in an effort to contradict DeMars. The District Court did not mention the evidence of DeMars. In The Mason, 2 Cir., 249 F. 718, 721, Judge Hough stated: "In cases of stranding, damage is commonly received in places where no eye can see that which happens at the time of harm, and in the nature of things the best evidence as to what was injured, and often excellent and persuasive evidence as to how the injury occurred, is given and must be given by competent and experienced men who subsequently examine the hurt. This being common knowledge among those accustomed to maritime affairs, it has long been the practice to admit as evidence, not only the oral testimony of marine surveyors, but their reports or surveys as documentary evidence."

There was, too, testimony that there was no untoward incident, apart from the incident at Savannah, which could have accounted for the hog and the other damage to the Anaconda's hull. Lupton and others testified that before the Savannah incident there was only the normal leakage in the Anaconda, probably due to blocked limber holes. Also, the testimony of Naylor, Gibbs, Adriansen and Colvin was to

228

the effect that there was a great increase in the leakage of the Anaconda after the barge left Savannah.

We are thus led to the conclusion that the Anaconda grounded in Savannah harbor, that the finding of the District Court that there was a mere scrubbing was clearly erroneous and that the damage to the barge's hull, ascertained at Havana, was the result of the grounding. See The Mason, D.C., 249 F. 718, 721; The Grapeshot, D.C., 42 F. 504, 505; The Vigilant, D.C., 10 F. 765, 766.

This brings us to the question of whether, if a grounding did occur, this grounding was due to the negligent navigation of the Syosset. We think it was. The Anaconda drew less than 24 feet and the channel, 500 feet wide, had a depth of 30 feet. Any grounding of the barge must, therefore, have been outside of the channel. There was evidence of a northeast current sweeping across the channel, that the Anaconda had a list to port, and that the grounding was on the northern, or starboard, edge of the channel.

Towage is not a bailment and the tug is not an insurer. The burden of proving negligence rests upon the tow. Stevens v. White City, 285 U.S. 195, 52 S. Ct. 347, 76 L.Ed. 699. But when an accident occurs under circumstances in which it would not ordinarily have occurred had the proper care been exercised, there is imposed upon the tug the duty of proving that the proper care was exercised. This is merely the application in admiralty of the well known rule of res ipsa loquitur. And the cases amply support the application of this rule when in a reasonably wide and well-marked channel the tow leaves the channel and is grounded. The burden thus imposed on the tug has not been met in the instant case. See, The Louisiana, 3 Wall. 164, 18 L.Ed. 85; United States v. Norfolk-Berkley Bridge Corp., D.C., 29 F. 2d 115, 126; The Severance, 4 Cir., 152 F.2d 916, 918; The Reichert Line, 2 Cir., 64 F.2d 13, 14; The Nat Sutton, 2 Cir., 62 F.2d 787, 789; The Perth Amboy, D.C., 48 F.2d 640, 643; The Golden Age, 2 Cir., 6 F.2d 877; Lehigh Valley Transportation Co. v. Knickerbocker Steam Towage, 2

Cir., 212 F. 708, 710; The E. V. McCaulley, D.C., 189 F. 827, 830.

Even if we accept (as we do not) the District Judge's finding that the Anaconda merely scrubbed bottom in Savannah harbor, the question might well arise whether libellant has not made out a case. In the absence of any other explanation of the unquestioned damage to the Anaconda's hull, this damage might well be attributed to this scrubbing. And the same presumption as to the negligence of the Syosset, and the causal relation of this negligence to such damage might arise as well from a scrubbing as from a grounding. We prefer, however, to rest our decision on a finding that there was a grounding of the barge rather than a mere scrubbing.

For the reasons indicated, the judgment of the District Court is reversed, the cause is remanded to that court with directions to enter judgment in favor of libellant and to refer the case to a master for the assessment of the proper damages.

Reversed and remanded.