Clyde CAILLOUET and J. D. McCulla, doing business as Caimac Barge Company, Libellants,

v.

THE Tug JACKIE G, her engines, etc., in rem, and Paul Galmich, doing business as Galmich Boat Works, Respondents.

No. 2903.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 12, 1961.

Pat Farrington Bass and Associates, New Orleans, La., for libellants.

George C. Ehmig, New Orleans, La., for respondents.

WALTER E. HOFFMAN, District Judge.

The owners of the barge Caimac 106, hereinafter referred to as Barge 106, seek a recovery for the cost of services rendered by a marine surveyor and salvage company in refloating Barge 106, following an alleged negligent grounding while the barge was in the tow of the tug Jackie G, owned by Galmich Boat Works, and, at the time in question, under charter to Beaumont Cement Sales.

Barge 106 was approximately one-half loaded with 20,000 sacks of "drilling mud", caustic soda, and one lift truck.

It was to be towed to a drilling location in Breton Sound, in the Gulf of Mexico, where Atlantic Refining Company was engaged in some work. The tug, in command of Captain Leonard Hiles, left Venice, Louisiana, around 5 p. m. on December 12, 1954, with Barge 106 in tow. After clearing the channel between Bird Island and the Gulf of Mexico, the tug and tow encountered a sudden storm accompanied by heavy seas and high winds up to approximately 35 to 45 miles per hour. Shortly after the tow line was extended, it parted and the barge went aground. Captain Hiles endeavored to bring the barge off the ground by the process of "washing", with the tug tied close to the barge and swinging the tug from side to side with the engines running at greater speed than normal in an attempt to wash the sand out from under the barge by the force of water from the propeller. A further effort was made to wash a channel to deeper water but, in this operation, the rudder of the Jackie G was damaged at a time when the barge was partially clear and a channel had been cleared approximately halfway to deep water. The washing process was discontinued because of the damaged rudder on December 13. The following day a marine surveyor, Captain Greenhalgh, was sent to the scene by the Marine Office of America. According to the survey and to Greenhalgh's recollection, the barge was high and dry, and for approximately 800 feet no more than eight inches of water could be observed. It was impossible to get near the barge and, of course, the equipment then available was inadequate. As some of the witnesses had initially placed the barge in a far more advantageous location closer to the channel, the difference is accounted for by reason of the fact that, in the interim, another storm had driven the barge further aground. With the work boat Robert Fayard, the Jackie G was pulled to deep water by running a line to the tug and washing her out, but the work boat was only able to get within approximately 80 feet of the. tug. It was impossible to get sufficiently close to Barge 106 in order to do any work.

On December 17 the marine surveyor made arrangements with a general contractor, H. B. "Buster" Hughes, at Harvey, Louisiana, for a spud barge equipped with a dragline, then located at Venice, to be towed to the Bird Island area. No tug was available at Venice [1] or Empire, but Hughes dispatched a tug from Harvey, approximately 75 miles away, to Venice where, at 8:30 a. m. on December 18, the tug and spud barge departed, arriving at Bird Island at 2 p.m. Due to the winds throwing heavy sprays over the spud barge, very little was accomplished prior to midnight as the sand was dropping back as fast as the dragline dug it out. A change to the clamshell bucket resulted in no improvement and the dragline bucket operation was resumed. At about midnight on the following day, December 19, the dragline had dug a channel so that the spud barge was approximately 150 feet from Barge 106. Continuing this operation, the equipment reached Barge 106 at 2 p. m. on December 20, and at 6 p. m the barge was afloat. The spud barge and Barge 106 were then towed to Venice where they arrived at 9:30 p. m. on December 20. The tug continued on to Harvey.

For these services a total bill of $2,965 was submitted; this amount including a fee and expenses of $500 for the marine surveyor. The parties have stipulated that the hourly rate charged for the spud barge, dragline and tug is reasonable, although respondents do not concede that the work was necessary and further do not agree that a charge should be made to bring the tug from Harvey to Venice, and return to Harvey.

Respondents argue that the salvage job could have been performed at an expense of $300 to $400. They submit the

[1]. The evidence is not clear as to whether a tug, other than one owned or controlled by Hughes, was available at Venice. The case was not heard until nearly five and one-half years after the services were performed. Understandably, the memories of some of the witnesses were not particularly good.

testimony of Hicks, an independent boat owner and operator, who frequently does salvage work. This witness indicated that when he first visited the scene, he estimated that he could use his fifty-foot boat equipped with a special propeller for washing operations and float the barge within six or seven hours. The same witness further stated that he made an offer to the marine surveyor to free the barge on a "no cure—no pay" basis for $400, but that Greenhalgh finally offered him $300 [2]. He likewise advised Captain Hiles of this proposition. Galmich, the owner of Barge 106, first learned of this offer several days thereafter but, when he finally reached this salvage expert, the latter was busy on other matters. As previously noted, in the interim another storm had driven the Barge 106 about 400 feet further into shallow water. Thus, when the party being responsible for the expense of the salvage operation first learned of the "no cure—no pay" offer, the circumstances had changed considerably and the offer could not have been accepted in any event.

■ Manifestly the respondents are liable for the negligent stranding of Barge 106. The only witness on this phase of the case was Captain Hiles and his testimony was very difficult to follow. Reduced to simplicity, certain facts emerge: (1) the tow line, bridle, fuel and crew for the tug Jackie G were furnished by Beaumont Cement Sales, the charterer of the tug and barge; (2) the tow line was one and one-half inches in diameter and, according to Hiles, was "a small line, insufficient for that kind of weather that we encountered"; (3) one portion of the tow line had been "burned" by caustic soda which had been stored in the same place where the tow line was located; (4) the storm encountered at 6 p. m. on December 12, 1954, was not an unusual or freak oc-

currence, and such storms are common in the Gulf of Mexico at all times of the year; (5) the crew aboard the Jackie G consisted of men used for the purpose of loading and unloading the cargo on the barge, and were inexperienced in handling the tug and tow during a storm; (6) the tug captain made no effort, before leaving port, to ascertain weather conditions and the possibility of storms in the area; (7) the tow line was lengthened to control the barge when the storm came up, and this brought the "burned" portion of the tow line into use with added strain being placed upon the line; and (8) the tow line parted.

While respondents initially contended that these faults and defects were the responsibility of the charterer, this argument was abandoned during the trial. It is, of course, fundamental that the faults of the charterer cannot be interposed as a defense in an action to recover for the cost of salvaging the barge. That the defective or inadequate tow line was the cause of the grounding cannot be doubted.

■ We need not consider libellant's contention that there exists a presumption of negligence arising from an "unexplained grounding" [3]. It is abundantly clear that libellant has sustained the burden of proof establishing the unseaworthiness of the tug, Jackie G. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

■ Finding that the salvage work performed was necessary, we turn to the hourly charges made for the trips between Harvey and Venice. The only testimony on this inquiry comes from Greenhalgh, the marine surveyor, who stated that it was the custom of the trade to return the tug and dragline to Harvey, even though the dragline had been picked up at Venice. Accepting this statement,

---

2. Greenhalgh has no recollection of this offer. He points out that, if made, the offer would have been accepted as Greenhalgh's client could not lose on a "no cure—no pay" basis. We do not accept the statement that Greenhalgh knew of this offer, but believe that it was imparted to Captain Hiles.

3. Sanders v. Meyerstein, D.C.E.D.N.C., 124 F.Supp. 77; The Anaconda, 4 Cir., 164 F.2d 224.

it is essentially immaterial whether another tug was available at Venice. Moreover, there would be some doubt as to the willingness of the owner of the spud barge and dragline to entrust this equipment to another tug and captain hired by the surveyor. The arrangements appear to be suitably in the nature of a "package deal".

Concluding that the libellants are entitled to recover the sum of $2965, plus legal interest from the date of judicial demand, together with taxable court costs, proctors for libellants will prepare and present, after endorsement by proctors for respondents, an appropriate decree.