347 F.Supp. 566 (1972)
MID-AMERICA TRANSPORTATION COMPANY, INC., a corporation, Plaintiff,
v.
ROSE BARGE LINES, INC., a corporation, in personam,
and
the M/V MARK EASTIN, its engines, boilers, tackle, equipment, etc., in rem,
and
M/G Transport Services, Inc., a corporation, in personam, Defendants.
No. 70 A 611 (3).
United States District Court, E. D. Missouri, E. D.
June 29, 1972.
*567 Lucas & Murphy, St. Louis, Mo., for plaintiff.
Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
WEBSTER, District Judge.
This is a case of admiralty and maritime jurisdiction pursuant to Rule 9(h), Federal Rules of Civil Procedure. The subject of the suit is a grounding which occurred in St. Louis Harbor on the Upper Mississippi River on February 4, 1970. Plaintiff, the owner of Barges MAT-71, MAT-70 and MAT-28 brought this action against Rose Barge Lines, Inc., a corporation, in personam, with whom it had a contract to tow the barges; against the towing vessel, M/V MARK EASTIN itself, in rem, and against M/G Transportation Services, Inc., a corporation, in personam, as owner of said towboat and operator thereof at the time of the accident under a fully found charter with Rose Barge Lines, Inc. Plaintiff seeks damages arising from an incident in which Barge MAT-71 was grounded and sunk, and in which MAT-70 and MAT-28 were also damaged. Recovery is also sought for cargo damage in certain of these barges. The damages suffered as a result of this occurrence to the barges and the cargo, including the survey costs, were stipulated to be $125,075.00, exclusive of plaintiff's claim for loss of use, as to which evidence was adduced by plaintiff at the time of trial.
The accident in question occurred at 12:20 P.M., on February 4, 1970. The M/V MARK EASTIN was proceeding downbound on the Mississippi River with 15 barges ahead in tow. These barges were arranged 5 long and 3 strings wide. Most of the barges were standard barges, 195 feet long and 35 feet wide, and were drawing between 8½ and 9½ feet of water. The barges were secured to each other by wires and thus were held together as a solid unit. The towboat, itself, was attached to the after end of the middle string of barges.
The M/V MARK EASTIN was a diesel powered towboat of steel hull construction 177 feet long with a 42-foot beam and a hull depth of 11'5", powered *568 by two engines generating 5,000 HP. It had twin screws.
The M/V MARK EASTIN departed Lock 27 at approximately 11:30 A.M. on the morning of February 4, with Captain Bateman at the controls. This lock, known as the Chain-of-Rocks Canal and Lock, is located near Granite City, Illinois at Mile 185.5.[1]
At 12:20 P.M. the starboard lead barge, MAT-71, went hard aground about 1,000 feet below Eads Bridge, at Mile 180. Prior to the stranding, Captain Bateman, the Master of the M/V MARK EASTIN and a licensed pilot, had turned over the controls of the vessel to Pilot Sides at about ¼ mile above Mile 181. Pilot Sides holds no license from the Coast Guard.
The tow in question was heading downstream with a destination below St. Louis and in doing so had to pass through a number of bridges, including the Veterans Bridge (Mile 180.2), Eads Bridge (Mile 180), and, below the stranding, the Poplar Street Bridge (Mile 179.2).
On the day in question the river stage in the St. Louis harbor was about 3.6 feet on the gauge. The navigable channel in the stretch of the river involved in this case, from a mile or so above Veterans Bridge southwardly to the Poplar Street Bridge, was along the shape of the Illinois shore. In the immediate vicinity of the casualty, the stretch between the Eads Bridge and the Poplar Street Bridge, the navigable channel extended from the Illinois bank westwardly across the river to an imaginary line running from the Illinois pier of the Eads Bridge southwardly to the Illinois pier of the Poplar Street Bridge. Five days before the grounding, on January 29, two buoys had been placed approximately along that imaginary line, about 10 feet East or toward the Illinois bank from the line, to serve as aids to vessels navigating between the Eads and Poplar Street Bridges. On January 29, according to Coast Guard Chief Schott's best determination with his Coast Guard sounding equipment, there was 10 feet of water along that particular line. On January 29 the Coast Guard had placed a black buoy about 500 feet below Eads Bridge 10 feet inside the line and about 500 feet above Poplar Street Bridge, again about 10 feet inside or East of the line. Coast Guard soundings that day failed to reveal the presence of any bar or sand buildup within the channel, i. e. that part of the river East of the imaginary line over to the Illinois bank. The Notice to Mariners showed 10 feet of water along the Western edge of the navigable channel and it advised mariners that the navigable channel was through the Illinois spans of all three of the bridges in the immediate vicinity of the grounding, Veterans Bridge, Eads Bridge, and Poplar Street Bridge. There were no soundings by the Coast Guard after January 29 and up until the time of the grounding. The river stage on January 29 was about the same as the stage on February 4 so that there should have been between 10 and 11 feet of water all along the imaginary line forming the western edge of the channel between Eads and Poplar Street Bridges.
All of the spans of the Eads Bridge, including the Illinois span, are constructed in the shape of arches. At the center of the arch of the Illinois span are located green navigation lights to aid vessels in the navigation of that span. The Illinois span of Eads Bridge is 498 feet wide.
The distance between the Eads Bridge and the Poplar Street Bridge is approximately six tenths mile. Along the Illinois bank a short distance below the place of the grounding in question, is located the Peabody Coal Dock. On the day in question, because of ice conditions on the river, a barge was extending about 120 to 140 feet out into the river immediately at the upper edge of the Peabody Coal Dock. This barge was called an ice sheer barge and its purpose *569 was to protect the dock from floating ice.
Because of the Eastward bend in the river, the current is deflected off of the Missouri shore toward the Illinois bank. The deflection of the current toward the Illinois bank is called a set by rivermen. On February 4, 1970 an eddie was actually present at the place of the grounding. However, the eddie may have been due in part to the presence of the sunken barge. An eddie is a condition wherein the flow of the current, instead of following its usual downstream path, flows upstream causing a whirlpool effect in the water.
The current as the M/V MARK EASTIN proceeded downward from Lock 26 was estimated to be about 3 to 4 miles per hour in the vicinity of the Bridges. About 1¼ miles above Eads Bridge, about even with the sand plant, Captain Bateman relinquished the controls to Captain Sides at 12:00 noon, the regular change of watch.
Pilot Sides had very little experience, if any, navigating this particular towboat. He had first boarded this vessel on January 24, 1970 and first undertook to handle it then. Asked whether he ever brought it through the Harbor of St. Louis at any time before the occurrence of this accident, he stated they were turning boats below St. Louis and he could have come up as far as Lock 26 to turn one, but he just does not remember.
Asked whether he had ever handled a tow of 15 barges with a 5,000 HP towboat through the Harbor of St. Louis, he stated he had handled it with a less boat, but not with one that size.
On the morning of the accident upbound vessels which had depthometers working had warned Captain Bateman over radio telephone that there was trouble as to the depth in that stretch of the river between those bridges and that there was 9 feet on the buoy line towards Missouri. He remained in the pilot house after being relieved by Pilot Sides. Sides was asked whether Captain Bateman talked to him about the possible problem of going through the bridges. He said Bateman had talked to him but he was busy watching the bridges, the set and one or another thing going through the bridges.
Sides also testified that the captain was talking to him about the harbor, running through the harbor there, that's dangerous river or something like that. Asked whether the captain reported to him what the conversations had been that morning with the upbound pilots, he stated that he could have, but he was watching the way he was going on down through the bridges. He recalled stating on deposition, when asked whether the captain had told him about any conversation he had with anyone in the harbor as to how to run this stretch of the river, as follows:
"A. How to run it?
Q. Yes.
A. He generally don't tell you how to run it. You're supposed to know."
The MAT-71, the lead barge of the starboard string, was drawing between 9' and 9½' of water. If the water were 9 feet at the Missouri edge of the channel, a barge drawing more than 9 feet would immediately run into difficulties along that line, particularly if full power would suddenly be applied, as this would cause water to be sucked out from under them and the barges would settle down. Sides, the pilot, did not know the width of the Illinois span of the Eads Bridge before the accident. He had to look it up that evening when he got home. He admitted stating on depositions it was only about 300 feet.
Prior to leaving the controls, Captain Bateman had backed the engines sufficiently to slow the boat to current speed or less in preparation for navigating the bridges. Captain Sides testified that when he assumed control, he used only enough power to steer, and that he allowed the boat to float at about current speed as he proceeded downstream, approached and navigated the bridges.
*570 Captain Sides started through the Illinois span of Eads Bridge with the center of his tow to the right of the center of the span. Captain Sides testified that he had the tow angled out toward the Missouri edge of the channel in order to compensate for the Illinois set of the current in event it caused the head of the tow to start falling off eastwardly, and to avoid colliding with the Peabody Coal Company facilities, located on the Illinois bank approximately half way between Eads and Poplar Street Bridges.
Sides testified that when the pilot house of the towboat was about clearing Eads Bridge, he saw some boiling up of water on the starboard side of the lead barge of his tow whereupon he applied full power ahead and attempted to swing the forward end of the tow towards the Illinois side.
He shoved his rudder over hard to the left side and she began to swing towards the Illinois side; but water was boiling up and so he stopped coming full ahead when he began feeling the bumping and tried to reverse the engines, but was only chipping them up when the lead barge MAT-71 came hard aground and came to a dead stop.
It was admitted in open court that there was no change in the position of the barge, MAT-71, after she ran hard aground and until Chief Schott came on the scene about a little after 4:00 P.M. From a sighting he took with the first pier of the Eads Bridge out in the river from the Illinois shore, he found the forward end of this barge two-thirds outside the channel towards the Missouri side, with the bow of the barge in 5 feet of water on one side and 6½ feet on the other. The after end of the barge extended about 5 to 10 feet into the channel. The remaining 185 feet of the barge was out of the channel. (No sighting was ever taken after the accident by either Bateman or Sides with reference to the location of the bow of the MAT-71 and the Illinois pier of the Eads Bridge. They never looked back.)
The damage ensued when the lead barge ran hard aground and the tow started breaking up. The barge which had run up over Barge MAT-71 and the remaining three barges in this string topped around and drifted downstream as did the lead barges in the middle and port string, and the tow started breaking up generally. The towboat itself proceeded downstream with those barges which it still had in tow and other vessels came out to try to round up those barges which were floating downstream.
The court finds from the credible evidence that the tow's starboard lead barge, MAT-71, was at least two-thirds outside of the channel when it ran aground. A presumption of negligence on the part of the towing vessel therefore arises from the occurrence of the accident. Bisso v. Waterways Transportation Company, 235 F.2d 741, l. c. 744 (5th Cir. 1956); National Transport Corp. v. Tug Abqaiq, 418 F.2d 1241, 1242 (2d Cir. 1969). As was stated in Humble Oil & Refining Company v. Tug Crochet, 422 F.2d 602 (5th Cir. 1970), l. c. 606:
"While a tug is not an insurer of its tow nor generally subject as a bailee to any presumption of fault, when she strands her tow under circumstances which ordinarily result in no such casualty, she has the burden of producing evidence which shows a reasonable excuse other than her own negligence."
In the instant case, the stranding occurred at a point beyond the navigable channel on a sand bar. The pilot, as the testified, knew full well that he had barges in tow which had a draft from 8½ to 9½ feet, and that the lead barge was drawing more than 9 feet. The captain had been warned by upbound vessels that morning that the water along the Missouri edge of the Illinois channel did not exceed 9 feet. He was present in the pilot house from change of watch until after the accident. Whether he informed the pilot of this or not, he permitted the pilot to operate an unfamiliar towboat with his tow so *571 as to get beyond the channel limits on the Missouri side where its forward end ran hard aground in 5½-6 feet of water.
In Sanders v. Meyerstein, 124 F.Supp. 77 (D.N.C.1954), the court said (p. 82):
"In a case such as this, where the towed vessel is unmanned, the tower is clearly and solely responsible for the safe navigation of the tug and tow. The tower is always charged with responsibility for knowledge of the conditions of navigation in the waters where the tug operates, including knowledge of channels, depth of water, obstructions, shoals and other dangers known generally to men experienced in navigation. The Severance, 4 Cir., 152 F.2d 916, certiorari denied [Stone v. Diamond Steamship Transportation Corp.], 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626. Although an injury to the tow raises no presumption of fault on the part of the tug, 86 C.J.S., Towage, § 34, the cases hold that evidence of grounding of a barge or other vessel in tow of a tug establishes a prima facie case of negligence on the part of the tug. The Reichert Line, 2 Cir., 64 F.2d 13; The Anaconda, 4 Cir., 164 F.2d 224; The Evelyn v. Gregory, 4 Cir., 170 F. 2d 899."
In The Anaconda, 164 F.2d 224 (4th Cir. 1947), the grounding occurred in a channel 30 feet deep and 500 feet wide. The court, after reviewing the evidence, concluded as follows:
"This brings us to the question of whether, if a grounding did occur, this grounding was due to the negligent navigation of the Syosset. We think it was. The Anaconda drew less than 24 feet and the channel, 500 feet wide, had a depth of 30 feet. Any grounding of the barge must, therefore, have been outside of the channel. There was evidence of a northeast current sweeping across the channel, that the Anaconda had a list to port, and that the grounding was on the northern, or starboard, edge of the channel.
"Towage is not a bailment and the tug is not an insurer. The burden of proving negligence rests upon the tow. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. But when an accident occurs under circumstances in which it would not ordinarily have occurred had the proper care been exercised, there is imposed upon the tug the duty of proving that the proper care was exercised. This is merely the application in admiralty of the well known rule of res ipsa loquitur. And the cases amply support the application of this rule when in a reasonably wide and well-marked channel the tow leaves the channel and is grounded. The burden thus imposed on the tug has not been met in the instant case. See, The Louisiana, 3 Wall. 164, 18 L.Ed. 85; United States v. Norfolk-Berkley Bridge Corp., D.C., 29 F.2d 115, 126; The Severance, 4 Cir., 152 F.2d 916, 918; The Reichert Line, 2 Cir., 64 F.2d 13, 14; The Nat Sutton, 2 Cir., 62 F.2d 787, 789; The Perth Amboy, D.C., 48 F.2d 640, 643; The Golden Age, 2 Cir., 6 F.2d 877; Lehigh Valley Transportation Co. v. Knickerbocker Steam Towage Co., 2 Cir., 212 F. 708, 710; The E. V. McCaulley, D.C., 189 F. 827, 830."
In Brown & Root, Inc. v. American Home Assurance Company, 353 F.2d 113 (5th Cir. 1965), the damaged barge ran aground in the Intracostal Canal. It was defendant's claim that the barge struck an unmarked, unknown shoal within a defined limit of the navigable channel. Apparently, the shoal had been formed through surface drainage of soil off the nearby cut banks. In holding for cargo and speaking of the captain's testimony, the court said:
"The trier of the fact was entitled to conclude that the Captain tipped off the real reason for the grounding in his complaint about channel lights. That statement revealed that in the Captain's own mind he must have *572 strayed too far from the center. It did not revealnor could ithow the existence of channel lights could have revealed a shoal which was completely submerged and wholly undisclosed. The point of this is not, as asserted by Cargo, that the failure of the Tow to navigate in the center of the channel was an independent ground of negligence. Rather, it is that the farther the tow was from the center, the closer it was to the edge of the defined channel, the exact location of which was difficult, if not impossible, to locate on the surface of the waterway. The permissibility of this inference is cumulatively supported by ample evidence of other fault, particularly with respect to the failure to maintain a proper lookout considering the high deckload."

Defense of an Inevitable Accident
In addition to contending that defendants were not in any way negligent, and that the MARK EASTIN or its equipment was not in any way unseaworthy, defendants have asserted the affirmative defense of inevitable accident, claiming that the natural forces prevalent in the river at the time and place in question formed and caused to be existing an underwater sand bar or obstruction which was unknown or unforeseeable and that defendants had no control over the forces of nature which caused the obstruction.
In the early case of The Lackawanna, 210 F. 262 (2 Cir.), discussing the question of inevitable accident, the court laid down the rule that "the burden [of such a defense] is heavily upon the vessel asserting [same]" (l. c. 264). See also The Rob, 122 F.2d 312 (2 Cir.). And the vessels "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." (L. Hand, J., in the Hylas, 1925 A.M.C. 921, 925); Moran Towing & Transportation Company v. M/S HOPERANGE, D.C., 226 F.Supp. 1018; Swenson v. The Argonaut et al., 204 F.2d 636, 640 (3 Cir.). Chief Schott testified that he found evidence that a sand bar had collected and extended into the channel, reducing the depth to 8 feet at the edge. This bar extended out a distance of five to ten feet. Even if the bar collected rapidly and without detection, as defendants contend, the defense is not available in view of this court's finding that the tow was well outside the channel when the grounding occurred, due to the negligent navigation and operation of the M/V MARK EASTIN. See Canal Barge Company, D.C., 323 F.Supp. 805 (1971).
Evidence was offered to show that on the day of the accident the approach buoy below the Eads Bridge, which is usually stationed 500 feet below and approximately 10 feet inside of the channel piers and the approach buoy on the Poplar Street Bridge located in similar position were off-station. The object of these buoys is to enable navigators at night or in fog using their radar to be able to pick up where these piers were located. Since the accident happened in daylight, namely, at 12:20 P.M. and the weather was good, with visibility of 15 miles, their being off-station was no defense to the grounding.

Damages
The cost of repairs, damage to cargo and other expenses arising out of this accident exclusive of loss of use, is stipulated to be $125,075.00 for the three barges.
Loss of use consists of the loss of profits or daily earnings which the vessels would have made had they not been damaged. Moore-McCormack Lines Inc. v. The Esso Camden, 244 F.2d 198, 203 (2nd Cir. 1957).
Captain Willard Fouts testified that the loss of profits per day attributable to each barge was $40.60. The number of days during which these vessels were out of service is as follows: MAT-71, 69 days; MAT-28, 24 days and MAT-70, 18 days. Total loss of time on the three vessels was 113 days. At a lost *573 profit per day of $40.60, the total loss of profits was $4,587.80.

Interest
Plaintiff seeks prejudgment interest on its award. In admiralty this is a matter in the court's sound discretion. The Umbria, 166 U.S. 404, 421, 17 S.Ct. 610, 41 L.Ed. 1053. The court has reviewed the docket entries in this case, and finds no evidence of dilatory activity by defendants. The defenses were not frivolous and in all the circumstances prejudgment interest does not appear warranted in this case. See Port City Barge Lines, Inc. v. St. Louis Grain Corp., and Wood River Harbor Service, E.D.Mo.; Regan, J., Cause No. 69A 548(3).

Conclusion
The foregoing constitutes the court's findings of fact and conclusions of law. In summary, the court finds and concludes that plaintiff is entitled to recover from defendants the sum of $125,075.00 plus $4,587.80 for loss of use, with interest thereon to run from date of judgment. The Clerk will enter judgment accordingly.
So ordered.
NOTES
[1] All mileages given are on the Upper Mississippi River.