**MID–AMERICA TRANSPORTATION COMPANY, INC., Plaintiff,**

v.

**NATIONAL MARINE SERVICE, INC.,**
and
**M/V NATIONAL PROGRESS, her engines, boilers, etc., Defendants.**

**No. 71 A 692(4).**

United States District Court,
E. D. Missouri, E. D.

March 23, 1973.

Lucas & Murphy, St. Louis, Mo., for plaintiff.

James W. Herron, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for defendants.

## MEMORANDUM

WANGELIN, District Judge.

This action is brought under the admiralty and maritime jurisdiction of the Court, pursuant to Rule 9(h), Federal Rules of Civil Procedure. It was commenced *in personam* [1] against defendant National Marine Service, Inc. (hereinafter referred to as "National") on November 8, 1971. National answered on behalf of itself and also filed a claim, a letter of undertaking, and an answer as owner of the M/V National Progress. Plaintiff Mid-America Transportation Company, Inc. (hereinafter referred to

---

1. Plaintiff instructed the United States Marshal not to execute service of the summons on the M/V National Progress

*in rem* for the reason that attorneys have entered appearance for the defendant motor vessel.

as "Mid-America") seeks recovery for injuries to its barge MAT–75 and the cargo carried therein, sustained while in the tow of the M/V National Progress en route from St. Paul, Minnesota, to St. Louis, Missouri, on the Mississippi River. The action was tried to the Court, sitting without a jury, on May 3, 1972.

After duly considering the premises, the Court hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The barge MAT–75 was built in 1958 and throughout the period of time relevant to this action was owned by plaintiff Mid-America. MAT–75 is a covered hopper barge of all welded steel construction. It is 195 feet long and has a 35 foot beam. The cargo hopper is 169 feet 3 inches long at its point furthest from the stern and it is covered by eleven cargo hatch covers, numbered 1 to 11 from bow to stern. When the cargo hatch covers are in place they protect the cargo from the elements of the weather. Drainage of rain water off the cargo hatch covers is provided by a series of rain gutters formed by the edges of the cargo hatch covers overlapping when in place. Each hatch cover contains two doors, one on the port side of the cover, the other on the starboard side. The hatch covers rest upon a coaming which extends the sides of the hopper 1 foot 3¼₆ inches above the deck. Between the coaming and the gunnel on the port and starboard sides of the barge is a walkway on the deck that is approximately 3 feet wide.

2. MAT–75 contains eight air bouyancy tanks formed by the sides and bottom of the cargo hopper, the outer sides and bottom of the barge, and certain bulkheads. These tanks are as follows: bow and stern rake tanks, both extending the width of the barge; and six wing tanks. Three wing tanks are in the port half of the barge and three in the starboard half, and are located one behind another from the bow to the stern rake tanks. The wing tanks are numbered 1, 2 and 3 from bow to stern, port and starboard.

The bow rake tank is 19 feet long at deck level and 30 feet long at the bottom of the barge. The No. 1 wing tanks are 52 feet 7¼ inches long; the No. 2 wing tanks are 53 feet 6 inches long, as are the No. 3 wing tanks. All eight tanks are separated from each other by waterproof bulkheads with the exception of the port wing tanks which are separated from the starboard wing tanks by non-waterproof bulkheads. Each wing tank has a single service manhole located in the deck walkway at the forward ends of the tanks.

3. On September 19, 1970, the empty barge MAT–75, pursuant to a contract with Mid-America, was taken by Minnesota Harbor Service from the Mid-America fleeting area at St. Paul, Minnesota, to the Minnesota Harbor Service Cleaning & Repair Station where cleaning and repair work was performed on it. The barge had previously carried coal.

4. On September 21, 1970, the barge was taken to the General Mills grain elevator where it was loaded with 42,760.50 bushels of No. 2 Northern Spring wheat consigned under a Mid-America Straight Bill of Lading to a firm in New Orleans, Louisiana. Under the terms of this bill of lading the freight charge had been prepaid and cargo insurance was to be provided by Mid-America to the amount of $2.00 per bushel which was $.145 less than the market value of that grade wheat delivered in New Orleans, Louisiana, on September 30, 1970. The bill of lading further provided that Mid-America shall not be liable for any damage to the cargo in excess of the insurance coverage, and that the prepaid freight charges were earned at the outset of the voyage and were not refundable.

5. On September 25, 1970, pursuant to agreements between Mid-America and United Barge Company and between United Barge Company and National, the grain loaded barge MAT–75 was

placed as the second barge, starboard string, in the tow of the M/V National Progress owned by National. The tow was made up three barges wide and three long. The M/V National Progress was positioned to push the tow from the stern of the third barge, middle string. National agreed to tow the MAT-75 for hire from St. Paul, Minnesota, to St. Louis, Missouri.

6. When the MAT-75 was placed in the tow of the M/V National Progress, this barge was inspected by the crew of the tug for water in the bouyancy tanks. No water, or an amount insufficient to pump, was found. The barge at this time was found to be drawing 9 feet at both bow and stern.

7. At approximately 4:00 p. m. on September 25, 1970, the tug and tow departed St. Paul, Minnesota, for St. Louis, Missouri on the Mississippi River. From this departure until midnight September 29, 1970, the bouyancy tanks of the MAT-75 were inspected periodically by the tug crew for water. No amount of water that required pumping was found and the barge remained in level trim drawing 9 feet at bow and stern.

8. Captain Ward of the M/V National Progress was replaced by Captain Self at 9:40 a. m., September 29, 1970, just below Lock 16 on the Mississippi River. Captain Self piloted the tug and tow through Lock 18 between 5:30 p. m. and 6:50 p. m., taking the tow through in two parts. Captain Self went off duty at midnight on September 29, just before the tug and tow proceeded through Lock 19, having been relieved by Pilot Crawford. Captain Self testified that between Locks 18 and 19 he remained in the channel of the river. Captain Self and the Mate testified that at midnight on September 29 the MAT-75 was in level trim and nothing unusual was noted about MAT-75.

9. From 12:15 a. m. to 1:00 a. m. Pilot Crawford locked the tug and tow through Lock 19 at Mile 364 in one trip. Sometime between 1:00 a. m. and 1:30

a. m., at a point several miles below Lock 19 Pilot Crawford reported to Captain Self that MAT-75 was taking on water. Deck Mate Shubert, who was off duty at this time, inspected the barge. By deposition Shubert testified that water was found in the No. 3 wing tanks at a level equal to the river level. He also found water in the No. 2 tanks, but not as much as in the No. 3. The boat's Tankerman Spruill testified by deposition that water came up between the stern of the MAT-75 and the headlog' of the following barge whenever the tow moved forward, and that the stern of the MAT-75 was 3 to 4 feet below the headlog of the next barge.

10. At the captain's direction the tug crew brought two small portable pumps onto the MAT-75 and began using them in an attempt to pump the No. 3 wing tanks. The pumps were positioned on the deck walkway, one on the port and one on the starboard side. The service manholes for the No. 3 tanks are located near the juncture of the Nos. 8 and 9 cargo covers; the service manholes for the No. 2 tanks are located near the juncture of the Nos. 4 and 5 cargo covers. During this attempt to lower the water level in the No. 3 tanks the tug and tow proceeded downriver, locked through Lock 20, and then at 7:25 a. m. stopped on the Illinois side at Mile 325. This pumping attempt on MAT-75 had made no headway on the water level and National's salvage crew was called to assist with larger pumps and to make repairs.

11. By 1:30 p. m. the salvage crew had arrived and began pumping with four 3-inch pumps. At 6:00 p. m. the water level in the bouyancy tanks had been lowered enough for repairs to be begun on the tanks. Salvage crew member Varble entered the No. 2 starboard tank, found a hole about an inch wide and about seven inches long located toward the stern of the tank on the knuckle, and patched the hole with the aid of a tug crew member. By 7:00 p. m. on September 30, 1970, the barge tanks had

been pumped and the tug and tow again got under way.

12. They arrived in St. Louis at 5:30 a. m., October 2, and the MAT–75 was delivered to a fleet area at Mile 182. Later on October 2 the barge was inspected by a surveyor employed by Mid-America at a fleeting area at about Mile 168. He found a small amount of water in the Nos. 2 and 3 tanks, port and starboard. He probed the cargo through the port grain door in the No. 11 cover and found wet grain near the bottom of the hopper. After this inspection Universal Barge Company moved the barge to its main fleet area.

13. On October 3, 1970, a surveyor employed by National inspected the barge and found 10 inches of water in the starboard No. 2 tank and 13 inches in the starboard No. 3 tank. He found the barge in uneven trim, being lowest at the starboard stern section. He also found fractures (which had been repaired) in the base of the bulkhead between the Nos. 2 and 3 starboard tanks; the lower 6 feet of that bulkhead had been distorted from 0 to 3 inches over a width of 20 inches.

14. On October 9, 1970, the surveyor employed by National probed the cargo in the area of hatch covers Nos. 10 and 11 and found wet grain approximately 9 inches deep. On this day the dry grain was transferred to another barge owned by Mid-America (MAT–88). During the transfer this surveyor noticed a conical column of wet grain adjacent to the starboard side of the hopper beneath the juncture of hopper covers Nos. 8 and 9. This point is near the service manhole of starboard tank No. 3. This column of wet grain extended from the top level of the cargo downward, widening as it descended. A similar column was found on the port side of the hopper below the juncture of covers Nos. 7 and 8. After the dry grain was removed, 9 inches of wet grain was found at the stern of the hopper. It was this surveyor's opinion that the grain moisture damage was caused by water entering the top of the cargo hopper. It was also his opinion that this water was discharged from carelessly placed pumps. This surveyor also discovered grain mixed with a black substance on the bottom and toward the bow end of the hopper. This latter condition was not caused by water entering the hopper.

15. On October 10 the surveyor employed by Mid-America inspected the cargo and found damage similar to that found by National's surveyor on the 9th of October. This surveyor also concluded that the conical moisture damage was caused by water entering the hopper from between the cargo covers. He concluded that the grain damage at the stern was not caused by water coming in from over the back wall of the hopper since no wet grain was found adhering to the upper portion of the hopper.

16. The damage to the MAT–75 was surveyed again in a shipyard on October 15, 1970, by both plaintiff's and defendants' surveyors who found that the bottom of the barge, at the knuckle plate, or the rounded portion of the hull where the side is joined to the bottom of the hull, had been shoved up from 0 to 4 inches over a length of 35 feet. The adjoining side plate had likewise been crimped upward over the same length. The internal structures had been distorted to conform to the exterior damage. A 9 inch long hole, with a maximum opening of 1 inch was found in the side of the barge at the bulkhead between the Nos. 2 and 3 starboard wing tanks, and two smaller fractures were found further aft. These injuries to the barge were caused by its having been grounded while in the tow of the MV National Progress. This grounding occurred between midnight on September 29, 1970, and 1:00 a. m. to 1:30 a. m. on September 30, 1970. Due to the lack of evidence the Court is unable to determine the object on which the barge was grounded, the specific time and the location of the grounding.

17. 221,490 pounds of moisture damaged grain remained in the barge after all the dry and good grain was removed

on October 9, 1970. The source of the moisture that damaged the grain was water which entered the cargo hopper through the junctures of hopper covers Nos. 8 and 9, and Nos. 7 and 8. Due to the lack of competent evidence the Court is unable to determine either the cause or source of the water which damaged the grain or the time at which such damage occurred.

## CONCLUSIONS OF LAW

Mid-America has alleged, alternatively, specific acts of negligence and a presumption of negligence which arises from the circumstances of the occurrence. The Court will treat the damage to the barge and to the grain separately.

### Damage to MAT–75

█ National was not a bailee, a common carrier, or an insurer of the MAT–75. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932). National owed Mid-America "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Ibid. at 202, 52 S.Ct. at 350. In Stevens the tow was inspected prior to being towed. and was found to be in the same condition as when received by the tower. Upon arrival at the destination it was discovered that the tow's hull planking was damaged above the water line. At trial the cause of the damage was speculated upon, but there was no evidence adduced as to when, how, or where the damage occurred. The Court stated

> The burden was upon petitioner to show that the loss for which he sought recovery was caused by a breach of that duty. The mere fact that the [tow] was in good order when received by respondent and in damaged condition when delivered does not raise any presumption of fault.

Ibid. The Court ruled that the nature of the injury warranted no inference of negligence on tower's part and the evidence was consistent with hypotheses that the tower was both negligent and nonnegligent. Ibid. at 204, 52 S.Ct. 347. Therefore, the Court rule that plaintiff had failed in his burden of proof.

In a recent case in this Court Judge Webster found that the evidence supported a presumption of negligence on the part of the towing vessel. Mid-America Transportation Company, Inc. v. Rose Barge Lines, Inc., 347 F.Supp. 566, 570 (E.D.Mo.1972). That case involved the grounding of a barge while in tow. The Court found that the barge was at least two-thirds outside the channel when it ran aground as a result of the accident. From this the Court determined that a presumption of negligence arose on the part of the tower, citing Bisso v. Waterways Transportation Company, 235 F.2d 741 (5th Cir. 1956); National Transportation Corporation v. Tug Abgaig, 418 F.2d 1241 (2nd Cir. 1969); Humble Oil & Refining Company v. Tug Crochet, 422 F.2d 602 (5th Cir. 1970); The Anaconda, 164 F.2d 224 (4th Cir. 1947); Brown & Root, Inc. v. American Home Assurance Company, 353 F.2d 113 (5th Cir. 1965); and Sanders v. Meyerstein, 124 F.Supp. 77 (D.N.C.1954). Judge Webster was able to determine the circumstances leading up to the grounding and allowed the recovery of the resultant damages.

█ In the instant case defendant asserts that, without evidence indicating the time and the location of the grounding, no presumption of negligence of the tower arises. The evidence sufficiently indicates that a grounding occurred. Plaintiff argues that the grounding alone raises the presumption. The Court disagrees.

In Bisso, supra, the Court found that calm weather, a current known to be strong, and nearly perfect conditions

> brought into play the sensible rule that, even though the engagement is in contract so that the duty of the tug toward the tow is that of due care only, with the consequent burden on the tow of establishing negligence, [citations omitted], a stranding which

occurs under circumstances which ordinarily results in no such casualty puts on the tug the obligation of some satisfactory explanation.

*Bisso, supra,* 235 F.2d at 744. The record indicated the courses of the ships and the object on which the barge stranded. However, no satisfactory explanation was proven.

More circumstances than mere evidence of damage gave rise to a shifting of the burden of proof to the tower in *Brown & Root, supra* (calm weather, a clear night, a waterway having over 150 feet of navigable channel); *Humble Oil, supra* (calm weather, and stranding on a well-known wreck outside a quarter-mile wide channel marked and maintained for regular navigation); National Transport Corp. v. Tug Abgaig, 294 F.Supp. 1080 (S.D.N.Y.1968), aff'd 418 F.2d 1241 (2nd Cir. 1969) (collision between tug and tow, external factors of wind and sea); and *The Anaconda, supra* (a channel 500 feet wide and 30 feet deep, a tow with a draft of less than 24 feet).

In United States v. Soriano, 366 F.2d 699 (9th Cir. 1966), the trial court had failed to determine the location of the casualty due to insufficient evidence. The Court of Appeals affirmed judgment for respondent ruling that a presumption of a pilot's negligence does not arise until the libellant "produces evidence which should lead the court to find that the casualty occurred at a place which should give rise to the presumption." at 709.

While in *Sanders, supra,* 124 F.Supp. at 82, the Court did state that "the cases hold that evidence of grounding of a barge or other vessel in tow of a tug establishes a prima facie case of negligence on the part of the tug," the evidence did show the time and the location of the grounding, and the width and depth of the channel there.

The Court is of the opinion that plaintiff has not produced sufficient evidence of the circumstances surrounding the grounding of the MAT–75 to give rise to an obligation on the part of the tower to explain away any presumption of negligence on its part.

### Damage to the Grain

The only direct evidence of the cause of the grain moisture damage, aside from the suggestive formation of the damaged grain itself, is the deposition testimony of Richard Yeomans that on October 3, 1970, Tug Goskie, a member of National's salvage crew that repaired the MAT–75 on September 30, told Yeomans that the tug's portable pumps had been positioned on the cargo covers and were discharging water directly onto the covers when he arrived. This deposition testimony relating Goskie's statement is not competent evidence on which the Court will rely in face of the testimony in the record that the pumps were placed on the deck and discharged the water away from the barge. See Mississippi Valley Barge Line Company v. Cooper Terminal Company, 217 F.2d 321 (7th Cir. 1955).

In consequence, the Court is of the opinion that plaintiff has not proven that the damage to the MAT–75 or to the grain cargo therein was caused by negligent acts for which National is liable.